IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| JAMIE TAYLOR, | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | No. 4:18-cv-00626-SWW |
| | * | |
| | * | |
| ABBOTT LABORATORIES, INC., | * | |
| WENDY NEIL, and JOHN DOES 1-3, | * | |
| | * | |
| Defendants. | * | |

## OPINION AND ORDER

Jamie Taylor brings this action against Abbott Laboratories, Inc. (Abbott), Wendy Neil, and John Does 1-3, alleging employment discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101 *et seq*., Section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794, the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq*., the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq*., and the Arkansas Civil Rights Act of 1993 (ACRA), Ark. Code Ann. § 16-123-101 *et seq*.  This action was originally filed in the Circuit Court of Pulaski County, Arkansas, but it was removed to this Court by Abbott on August 31, 2018.  The Court subsequently dismissed Taylor's claims

against Neil.[1]

Now before the Court is a motion of Abbott for summary judgment [doc.#23]. Taylor has responded in opposition to Abbott's motion and Abbott has replied to Taylor's response. For the reasons that follow, the Court grants Abbott's motion for summary judgment.

I.

Abbott hired Taylor as a Sales Specialist on June 2, 2008. Taylor worked in Abbott's Point of Care (APOC) business. The APOC business develops, manufactures, and sells portable, hand-held blood analyzers to provide real-time, lab quality results at the patient's side to speed up decision-making and ensure the appropriate care is provided where and when it is needed.

As a Sales Specialist, Taylor sold APOC products, such as the i-STAT Analyzer, Cartridges, and Data Management to hospital laboratories within her territory in Arkansas. In that role, Taylor was responsible for maintaining and expanding sales in existing accounts, and developing new business within her territory. As a Sales Specialist, customer relationships are of the utmost importance, and an essential function of Taylor's job was to visit customers at their place of business.

---

[1] Taylor has not identified any John Does and the time for doing so has passed.

As a Sales Specialist, Abbott expected Taylor to conduct onsite visits to hospital laboratories within her territory to make sales, to assist with implementation of Abbott's products, and to provide customer-focused service. The Sales Specialist position is an outside sales role, and thus Abbott expected Taylor to spend a significant portion of her time, up to 50%, traveling to visit hospitals within her territory.

Following a realignment in early 2016, Taylor began reporting to Neil, a Regional Sales Manager. According to Taylor, she and Neil "just didn't click" and "just couldn't communicate very well," and Taylor admits that she struggled with timely completion of important administrative and reporting duties.[2]

Neil states that after she took over supervision of Taylor, one of Taylor's customers, Customer 1, contacted her to have Taylor removed from the account.[3] According to Neil, Customer 1 asked Abbott to assign a different representative to the account, telling Neil that Taylor had been condescending to the customer and failed to respond to the customer in a timely manner on contract negotiations. Abbott states it made the business decision to honor Customer 1's request that Taylor be removed from the account, and that Neil took over responsibility for it.

---

[2] See Pl.'s Resp. to Def.'s St. of Mat. Facts, at ¶ 9 [doc.#30].

[3] Abbott states that for purposes of customer privacy, it has redacted the names of its customers as the specific identity of the customers is not relevant to its motion.

Following Taylor's removal from Customer 1's account, Neil states she counseled and coached Taylor on improving her interactions with customers and being more responsive.

In early August 2016, Abbott conducted Business Reviews, during which each Sales Specialist presents a business case for a current opportunity and receives feedback from his or her first and second level managers, the General Manager, and other managers within the APOC business. Among others, Taylor's Business Review presentation was attended by Neil and APOC General Manager Mark Klopping.

Taylor's second-level manager, Central Area Sales Director Brad Cox, provided his own feedback, as well as feedback he received from Klopping, about Taylor's performance at Business Reviews. Cox said that Taylor's Business Review "was the worst one presented out of the 4 regions" and the underlying data made clear that she had thrown it together at the last minute. Taylor, citing only her own deposition testimony, denies this but does admit that her last-minute flurry of activity before the Business Review "looked bad." According to Cox, Taylor's presentation made clear that her pipeline for growing her business was "non-existent" and "in the worst shape of all the [APOC Sales Specialists] in the Central Area." At this point in the year (August 2016), Taylor was the lowest-ranked Sales

Specialist on her team and was ranked 75th out of 92 APOC Sales Specialists nationally. Taylor does not address her ranking in the year 2016 but references earlier years in claiming she was in the top 25 of her sales team nationally.

Following the Business Review, Cox directed Neil to consult with Employee Relations (ER) about Taylor's performance problems and to put together a formal coaching memo with goals designed "to improve [Taylor's] performance in territory management, customer interactions and overall sales and pipeline metrics." Before a formal coaching memorandum was prepared, however, a second customer sought to have Taylor "banned" from its facilities. In this respect, on September 12, 2016, Cox received an email sent on behalf of a Regional Vice President at Customer 2 that Customer 2 "would like to discuss having [Taylor] banned from his facilities" due to "numerous problems" and her failure to follow "certain procedures when visiting the lab" despite multiple requests. In addition to Customer 2's Regional Vice President, one of its lab directors also raised concerns about Taylor's conduct. Among other things, the lab director reported that Taylor was not scheduling appointments sufficiently in advance and was coming to the lab when the lab director was not there and when the point of care coordinator did not have time to meet with her. Taylor also informed the lab director "that she [Taylor] might be losing her job due to the account changes" at one of Customer

2's hospitals.  The Regional Vice President also reported that Taylor had spoken directly with one of the physicians in violation of Customer 2's established protocol.  Taylor, citing only her own deposition testimony, denies all this.

Cox followed up with Customer 2's Regional Vice President who explained that "specific guidelines [were] laid out for [Taylor] to comply as it related to promotional activities and inclusion of the Lab" but that Taylor "disregarded these instructions ..."  Customer 2 told Cox that Taylor was "destroying any recent goodwill with Abbott and [Customer 2] relationships and that a change was requested" to the Sales Specialist assignment at Customer 2.  According to Taylor, Customer 2 was one of her largest accounts.  Abbott honored Customer 2's request and reassigned the account.

On September 14, 2016, Neil, following Cox's directive, contacted Abbott's ER group for assistance in managing Taylor's performance.  Amy Frost, an ER Specialist, was assigned to the matter and assisted Neil in preparing a performance improvement plan (PIP), which was delivered to Taylor on September 28, 2016.  The PIP summarized Taylor's performance deficiencies and stated that her performance would be measured over the next 60 days, and that failure to demonstrate immediate, consistent, and sustained improvement could result in disciplinary action during the 60 days.  The PIP advised Taylor that she needed to

6

maintain positive customer relationships, improve pipeline development by identifying her top five opportunities in her territory planner and developing specific action steps to achieve them, deliver sales planners to Neil on Fridays, along with completed action items, complete contract renewals, maintain her existing book of business, and accurately complete administrative tasks.

Neil determined that after her coaching, Taylor did not meet the requirements of her PIP during the initial 30-day review period. For example, Neil determined that Taylor failed to deliver weekly sales planners as required under the PIP, even after Neil gave her specific examples of what was expected. Neil states that after Taylor disregarded her instructions, she further counseled Taylor about the sales planners in November 2016.

Neil states that Taylor also did not demonstrate that she was maintaining positive customer relationships. For example, on October 25, 2016, Neil and Taylor attended a client meeting together. During their meeting with the laboratory director, Taylor admittedly referred to another employee of the customer as a "mess." After the meeting, Neil told Taylor that she viewed Taylor's comment as inappropriate for a customer meeting.

According to Neal, Taylor also failed to maintain her existing business as required under her PIP. Neil states that on October 27, 2016, the District Manager

7

for Customer 3 told her that Customer 3's Lab did not "have a good relationship" with Taylor, didn't want to talk to her, and was "super mad."

On November 1, 2016, Neil delivered to Taylor a performance review memo and gave her another 30 days to improve her performance. The memo stated that failure to demonstrate immediate, consistent, and sustained improvement could result in termination during or after the 30 days.

On November 28, 2016, Taylor copied a customer on her response to an internal email, which the original sender "expected…to be an internal discussion." Neil counseled Taylor that she should not have shared the information with the customer. Neil also states that she believed Taylor had been dishonest with her about whether Taylor had intentionally included the customer on the email.

Neil states that what she considered to be Taylor's dishonesty and poor judgment, in addition to her customer issues and other performance failures, warranted moving forward with termination regardless of what else may transpire over the approximately two weeks remaining in the extended PIP period. Accordingly, on December 1, 2016, Neil states she requested that ER review Taylor's performance to determine whether Abbott should terminate Taylor's employment because she was not demonstrating immediate, consistent, and sustained improvement. The following day, Neil submitted a formal memorandum

8

reflecting the reasons she believed that termination of Taylor's employment was warranted. In the memorandum, Neil explained that in addition to losing customers, Taylor gave conflicting answers when Neil questioned her about the November 28 email that copied a customer on an internal conversation. Neil concluded:

> **Not Successful with Meeting Expectations**: Requesting a review for termination. Jamie's access has been revoked at 6 hospitals out of the 20 she covers representing. Due to her expulsion, I have to assign another representative in Oklahoma to cover Jamie's accounts. I also have to travel into Arkansas on a much more than regular basis now to meet with the upset customers. Jamie has become a concerning liability as a POCS at ABBOTT Laboratories.

On January 5, 2017, ER completed its review of the termination request and recommended that Taylor's employment be terminated. Meanwhile, on December 13, 2016, Taylor requested and was granted a medical leave due to stress. Taylor's medical leave was paid.

Taylor returned to work on February 3, 2017 with no restrictions. Abbott terminated Taylor's employment on February 6, 2017. Neil, along with Cox, communicated the termination decision to Taylor, explaining that Abbott terminated her employment because she had been placed on a PIP, had failed to meet the expectations of the PIP, and had been removed from customer accounts at

9

the customers' request. Taylor was 54 years old at the time Abbott terminated her employment.

II.

Abbott moves for summary judgment on grounds that Taylor has no evidence to substantiate her claim that it was her age, alleged disabilities, or FMLA-protected leave, and not her admitted poor performance, that factored into the decision to terminate her employment, and that her retaliation claims fail because her complaints are not statutorily protected and her termination was approved before she requested and was granted leave.

A.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party must respond by submitting evidentiary materials that set out "'specific facts showing ... a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and quotation marks omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

B.

In her response to Abbott's motion for summary judgment, Taylor does not address her ADA, RA, FMLA, ACRA, and retaliation claims. Accordingly, those

11

claims are waived. See *Satcher v. University of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes a waiver of that argument"). The Court now turns to Taylor's ADEA claim, the sole remaining claim in this action.

Because Taylor has presented no direct evidence of age discrimination, her claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Hilde v. City of Eveleth*, 777 F.3d 998, 1004 (8th Cir. 2015).[4] Under that framework, Taylor is first required to establish a prima facie case of age discrimination by showing (1) she was at least 40 years old, (2) she suffered an adverse employment action, (3) she was meeting her employer's reasonable expectations at the time of the adverse employment action, and (4) she was replaced by an individual who was substantially younger. *Holmes v. Trinity Health*, 729 F.3d 817, 822 (8th Cir. 2013) (citation and quotation marks omitted). If Taylor establishes her prima facie case, the burden shifts to Abbott to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 468 (8th Cir. 2011) (citation omitted). If Abbott does so, the burden shifts back to Taylor to

---

[4] Direct evidence of discrimination is evidence that shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *McCullough v. University of Arkansas for Medical Sciences*, 559 F.3d 855, 860 (8th Cir. 2009) (quotation marks and citation omitted).

12

establish that the proffered nondiscriminatory reason is pretextual. *Id*. To survive summary judgment, Taylor must point to enough admissible evidence to raise genuine doubt as to the legitimacy of Abbott's motive. *DePriest v. Milligan*, 823 F.3d 1179, 1186 (8th Cir. 2016). The ADEA requires a plaintiff to show that age was a "but-for" cause of the challenged adverse employment action. *Haigh*, 632 F.3d at 468 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

Taylor has not presented a prima facie case of age discrimination as she has not demonstrated that she was meeting Abbott's reasonable expectations at the time of her termination and she has not alleged she was replaced by an individual who was substantially younger. But even assuming that Taylor has presented a prima facie case of discrimination, Abbott's reasons for terminating Taylor's employment--because she had been placed on a PIP, had failed to meet the expectations of the PIP, and had been removed from customer accounts at the customers' request--are legitimate, non-discriminatory reasons that Taylor has not shown to be pretextual.

As evidence of age discrimination and pretext, Taylor first points to one stray age related remark she attributes to Neil that "sometimes people feel that this job is better suited for younger people." But stray remarks standing alone do not give rise to an inference of discrimination, *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876 (8th Cir. 2008) (citation and quotation marks omitted), and other than this one

13

remark by Neil, Taylor was not able to identify any other age related remarks made by a manager or decision-maker at Abbott. Moreover, this remark is not sufficient to find that age discrimination actually motivated Taylor's termination because an inference is required to connect this remark to Taylor as it does not mention her or indicate that Neil considered her older.[5] *Ramlet v. E.F. Johnson Co.*, 507 F3d 1149, 1153 (8th Cir. 2007). According to Taylor, Neil made this remark while the two "were just talking about life in general."

Taylor also argues that even though she was on her PIP, she continued to perform her job duties in an "exceptional manner" and outperformed the members of her sales team. As evidence of this, Taylor first points to an October 2016 email concerning her participation in a "Fired Up" campaign and that she was commended for "growing and/or protecting their business." But that email was sent to "All Sales USA" and included eight individuals in the email. It is not clear whether the sender of that email was aware of the particular manner in which Taylor was performing her job duties. Regardless, the email does not render meaningless Taylor's documented performance deficiencies, including requests from customers that Taylor be removed from their accounts. To the extent Taylor suggests such requests were not made, she has not presented any evidence to the

---

[5] Neil was 51 years old at the time of Taylor's termination.

contrary.  "The non-moving party 'may not rely on allegations or denials,' however, but must substantiate h[er] allegations with 'sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation [or] conjecture."  *Ball v. City of Lincoln, Neb.*, 870 F.3d 722, 727 (8th Cir. 2017) (quoting *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)).  This, Taylor has failed to do.

Taylor next points to a document which she claims shows that her year-to-date growth was 21% as of August 2016 and that this was "the highest of her region."  But the document to which she refers is a "Loss and Decline August 2016 Update" that shows a 21% *decline* in Taylor's business.  One of the requirements of Taylor's PIP required that she maintain her existing book of business.

Finally, Taylor points to a November 2016 email in which she is given "high praise" for implanting a "Go Live" campaign and for training nursing staff.  This email, however, does not render meaningless Taylor's documented performance deficiencies, including requests from customers that Taylor be removed from their accounts.

In sum, Taylor has not pointed to enough admissible evidence to raise genuine doubt as to the legitimacy of Abbott's motive in terminating her employment and she has not shown that age was the but-for cause of her

termination.  Taylor may have felt that she was performing her job duties in an "exceptional manner," but Abbott determined that she was not.  There is no indication that age factored into that determination and it is not the function of this Court to second guess Abbott's determination regarding Taylor's job performance.  See *Elam v. Regions Financial Corp.*, 601 F.3d 873, 880-81 (8th Cir. 2010) (federal Courts do not sit as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination").

### III.

For the foregoing reasons, the Court grants Abbott Laboratories, Inc.'s motion for summary judgment [doc.#23].  The Court will enter judgment accordingly.[6]

IT IS SO ORDERED this 15th day of July 2019.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE

---

[6] The motion of Abbott to continue [doc.#36] is denied as moot.